IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARY VALVANIS, JOHN VALVANIS AND GEORGE VALVANIS,<br><br>               Plaintiffs,<br><br>     vs.<br><br>ROBERT B. MILGROOM, and NADA MARTL aka NADA R. MILGROOM,<br><br>              Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. 06-00144 JMS-KSC<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT ROBERT B. MILGROOM AS TO THE SECOND AMENDED COMPLAINT |

## <u>ORDER GRANTING PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT ROBERT B. MILGROOM AS TO THE SECOND AMENDED COMPLAINT</u>

## I. <u>INTRODUCTION</u>

Plaintiffs Mary, John, and George Valvanis ("Plaintiffs" or "Valvanis Family") allege that Defendants Robert B. Milgroom ("Milgroom") and Nada Martl ("Martl") (collectively, "Defendants") engaged in a scheme to hide and shield assets from Milgroom's creditors, including Plaintiffs. Specifically, Plaintiffs allege that Milgroom and Martl sought to evade Milgroom's creditors by using Milgroom's money to purchase real property located in Honolulu, Hawaii (the "Hawaii Property") and then transferring the Hawaii Property to Martl.

Plaintiffs seek, among other things, to satisfy Milgroom's debt to Plaintiffs through the Hawaii Property.

On February 2, 2009, Plaintiffs filed separate Motions for Default Judgment against both Milgroom and Martl.  Default has been already entered against each Defendant for very different reasons.  The court entered default against Milgroom on December 30, 2008 on the Second Amended Complaint ("SAC") as a sanction for his willful conduct of violating numerous court orders and rules in an attempt to prevent this action from proceeding on the merits.  In comparison, default was entered against Martl on December 14, 2007 after she failed to file an answer to the First Amended Complaint ("FAC").  Since this time, Martl has not substantively participated in this action and the court has declined to enter default judgment against her until the claims against Milgroom are adjudicated to prevent the possibility of inconsistent judgments.

Given these very different contexts of default against each Defendant, the court addresses each of Plaintiffs' Motions for Entry of Default Judgment in separate orders and finds that default judgment against both Defendants is warranted.  In this Order, the court GRANTS Plaintiffs' Motion for Entry of Default Judgment Against Milgroom on their claims against him in the SAC.

## II.  BACKGROUND

A.   **Factual Background**[1]

Plaintiffs allege that Defendants engaged in an elaborate scheme to hide and shield assets from Milgroom's creditors, including Plaintiffs.

### 1.   *Milgroom's Creditors*

Plaintiffs assert that they became Milgroom's creditors from business dealings that occurred in the 1980s, and which are the basis of litigation spanning from 1987 through the present.  In April 1987, Plaintiffs filed a lawsuit against Milgroom in Massachusetts (the "Massachusetts Action") alleging that he "illegally used his influence as an attorney and certified public accountant for the Valvanis Family business . . . to divert to his own benefit monies raised by the

---

[1] Plaintiffs present much more evidence in support of entry of default judgment against Milgroom than they do in support of entry of default judgment against Martl.  The court attributes this difference to the contrasting contexts in which default was entered against each Defendant.  Entry of default as a sanction occurs only in extraordinary circumstances, which was the case for Milgroom.  *See Valvanis v. Milgroom*, 2008 WL 5412420, at *12 (D. Haw. Dec. 30, 2008) (concluding that default was warranted because "this case presents extreme circumstances of a defendant who took every effort to derail its efficient adjudication").  The court therefore requires Plaintiffs to actively present evidence showing the merits of their claims against Milgroom.  *See TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (stating that the district court "exceeded the requirements of [Rule 55] by taking extensive evidence on *all* allegations in the complaint including damages").  In contrast, Martl has wholly failed to participate in this action for 18 months and the court therefore applies "the general rule [] that well-pled allegations in the complaint regarding liability are deemed true [and] [t]he district court is not required to make detailed findings of fact."  *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

3

mortgaging of and sale of the company assets."[2]  SAC ¶ 12; *see* Pls.' Ex. 11 (Massachusetts Action docket sheet).

In December 1991, the parties agreed to refer their dispute to a special master to "make findings of fact and conclusions of law [that] shall be final and binding on the parties."  Milgroom Ex. B.  In 1994, a Special Master in the Massachusetts Action issued his "Special Master's Report," which, under "Ultimate Primary Findings," found that Plaintiffs owed Milgroom $150,000.  *See* Doc. No. 74, Martl Ex. B-1 (attaching portions of Special Master's Report).[3]  After the Special Master's Report, both parties participated in the Massachusetts Action -- the parties filed motions for extensions to file objections to the Special Master's Report, Pls.' Ex. 11 (docket entries 90-94), Milgroom's attorney filed a motion to withdraw, *id.* (docket entries 97a, 98b), and Milgroom appeared pro se.  *Id.*, Pls.' Ex. 15 ¶¶ 12, 18.

The Massachusetts Action then stalled for many years, but began to move forward again in the early 2000s.  SAC ¶ 13; Pls.' Ex. 11.  On October 18,

---

[2]  Milgroom's certified public accountant license was suspended in 1992, *see* SAC ¶ 16; Pls.' Ex. 93, and he was suspended from the practice of law for unethical conduct in 1998.  *See* SAC ¶ 16; Pls.' Exs. 94-95.

[3]  Milgroom's Opposition refers to the Special Master's Report, but does not attach it as an exhibit.  The court therefore cites to it from another filing to provide a full picture of those proceedings.

2005, the court in the Massachusetts Action entered default against Milgroom after he failed to appear for a final pretrial conference or otherwise participate in the action. *See* SAC ¶¶ 57, 72-73; Pls.' Exs. 11 (docket entry 112), 12 (warning Milgroom that he must appear at the October 18, 2005 pretrial conference or default will be entered against him). On July 3, 2007, the court issued a Memorandum of Decision on Damages Trial and Order for Judgment, ordering judgment and damages in favor of Plaintiffs totaling almost $4 million. Pls.' Ex. 13.

In addition to the Massachusetts Action, on January 10, 2002, Milgroom's first wife's family, the D'Ambrosio family, filed a separate action against Milgroom in Massachusetts (the "D'Ambrosio Action"). The D'Ambrosio family alleged that Milgroom fraudulently used the power of attorney he obtained from his terminally ill wife to change the names on several bank accounts that were intended for his wife's family beneficiaries so that he could withdraw those monies for his benefit. SAC ¶ 49; Pls.' Ex. 22. The D'Ambrosio court attached Milgroom's Broadway Bank account on January 11, 2002, Pls.' Ex. 22 at 3 ¶ 2, and Milgroom was served the complaint on March 1, 2002. *See* Pls.' Ex. 32 (letter from Milrgoom to Jerry Nissenbaum). On May 14, 2007, the court in the D'Ambrosio action found that Milgroom's conduct was "reprehensible and

5

shameful, " Pls.' Ex. 22 at 29, and that all of the money he took (over $2 million)

rightfully belonged to his first wife's estate.  *See id.* at ¶ 109.

### 2.   *Milgroom and Martl*

Milgroom married Martl on September 11, 2001, six months after his

first wife passed away.  SAC ¶¶ 27-28; *see also* Pls.' Ex. 63 (listing wedding date).

The SAC alleges that Milgroom married Martl with an "actual intent, scheme and

plan to fraudulently transfer Milgroom's assets to Martl and/or to Milgroom and

Martl as husband and wife and/or to Milgroom and Martl as tenants by the entirety

for the purpose of hindering, delaying, and defrauding Plaintiffs and other creditors

of Milgroom."  SAC ¶ 28.  In support of this statement,[4] the allegations of the SAC

and the evidence presented demonstrate that Milgroom

(1) had an estimated net worth of over $10 million when he married Martl and

soon after transferred almost all of his monies to Martl; (2) purchased with the

transferred monies the Hawaii Property to be held by them as tenants by the

entirety and then transferred his interest to Martl; (3) got a divorce in June 2005 by

---

[4] In addition to the evidence cited below, Plaintiffs rely on statements from other courts that Milgroom transferred funds to Martl "as part of a fraudulent divorce in Hawaii specifically to remove those assets from the jurisdiction of [Massachusetts state court]," Pls.' Ex. 22 at 28 ¶ 132, and that Milgroom "failed to account for millions of dollars in real estate and financial transactions concerning the [Hawaii] Property, or to offer any credible explanation regarding such transactions."  Pls.' Ex. 96 at 13 ¶ 3.  Plaintiffs provide no explanation for why these court statements should be taken as fact in this action, and the court therefore does not rely on them to prove allegations of the SAC.

providing false information regarding his and Martl's assets; and (4) fraudulently declared bankruptcy only two weeks after the divorce.  The evidence regarding each of these allegations is as follows:

> ### a.    Milgroom's transfers of monies to Martl in 2002

Milgroom has testified that Martl agreed to marry him and give up the real estate business they were involved in together[5] in exchange for half of Milgroom's net worth, which was estimated to be at least $10 million.  Pls.' Ex. 91 at 111-12; *see also* SAC ¶ 31; Pls.' Ex. 26 at 5 (stating that prior to moving to Hawaii, Milgroom maintained up to $11.5 million in a number of different accounts and institutions).  In lieu of giving Martl $5 million, Milgroom asserts that he added her name to all of his financial accounts.  SAC ¶ 33; Pls.' Ex. 91 at 136.

Despite Milgroom's assertion and their purported agreement for Milgroom to give Martl half of his net worth, in 2002 alone, Milgroom actually transferred $9 million of his funds to Martl, who deposited them in a German bank

---

[5]  Prior to their marriage, Defendants were involved together in two Florida real estate investment companies, *see* SAC ¶¶ 18-25, from which Milgroom derived income. *See* Pls.' Ex. 39.  The SAC alleges that Milgroom funded these companies in whole or substantial part.  SAC ¶¶ 21, 25.

account.[6]  *See* SAC ¶¶ 38-39; *see also* Pls.' Ex. 26 at 6 (stating that as of the time of his report, Plaintiffs' expert determined that Milgroom withdrew $7.3 million from his Treasury Direct accounts and transferred them to other accounts).

Plaintiffs have presented evidence that on March 1, 2002 -- the same day that he was served the D'Ambrosio Complaint -- Milgroom transferred $1.05 million of his funds and $950,000 of their joint funds to Martl's Bank of America checking account.  *See* Pls.' Ex. 32.  Martl subsequently transferred the resulting $2 million to her German bank account.  *Id.* (collecting Milgroom and Martl's financial documents showing transfers of funds from various accounts to Martl's German bank account).  That same month, Milgroom sold, before their maturity dates, several of his Treasury Direct securities totaling over $4.5 million and ultimately had those funds transferred to Martl's German bank account.  Pls.' Ex. 33.  On April 25, 2002, Martl transferred to her German bank account an additional $2.7 million, which can be traced back to Milgroom's funds.  *See* Pls.' Ex. 29 (collecting Milgroom and Martl's financial documents showing transfers of funds from Milgroom's personal funds to purchase real property and a yacht, only to be sold shortly thereafter and the funds deposited in Martl's account).

---

[6]  Plaintiffs also presented evidence of smaller transfers from Milgroom's accounts into joint accounts, which the court does not outline here.  *See* Pls.' Exs. 30 at BOA 000073 and BOA 00152; Pls.' Ex. 31 at BOA 00073, BOA 00188, BOA 22167, and BOA 22168.

b.      *Milgroom and Martl purchase the Hawaii Property*

On August 2, 2002, Defendants purchased the Hawaii Property, located at 253 Puuikena Drive, Honolulu, Hawaii 96821, for $5.2 million cash. SAC ¶¶ 43-44.  The SAC alleges that Defendants "created title to the Hawaii Property as tenants by the entirety with the intent to hinder, delay and defraud Plaintiffs so that Plaintiffs could not attach, execute on, or otherwise liquidate the Hawaii Property to satisfy Plaintiffs' claims." *Id.* ¶ 46.

Plaintiffs have presented evidence that Defendants made this purchase only two weeks after the court in the D'Ambrosio Action denied Milgroom's motion to dismiss. *See* Pls.' Ex. 22 at 4 ¶ 9.  Further, the Hawaii Property payment came from funds that originated in whole or in substantial part from Milgroom's self-estimated $10 million net worth.  SAC ¶ 50.  Specifically, on July 12, 2002, $6,499,982 was wire transferred from Martl's German bank account -- the same account into which Martl deposited $9 million from Milgroom -- to First Hawaiian Bank and deposited into Defendants' joint checking account.  Pls.' Exs. 28 ¶ 23, 57, 58.  Milgroom then drew a check from this account for $7,125,000 payable to Milgroom, and deposited it into Defendants' joint savings account.  Pls.' Exs. 28 ¶ 24, 58.  Finally, Milgroom used these funds to purchase the Hawaii Property.  SAC ¶ 43; Pls.' Exs. 28 ¶ 25, 58, 59.

9

       c.     *Milgroom's additional transfers of assets to Martl*

From January through May 2003, Milgroom transferred additional assets to Martl.  Specifically, Milgroom liquidated $6.3 million in Treasury Direct investments held jointly by Defendants and transferred those funds to Martl's checking account.  *See* Pls.' Ex. 28 ¶¶ 13-21.  Martl subsequently transferred $6 million to her German bank account.  *Id.*

In addition to these monetary transfers, on May 13, 2003, Milgroom transferred his interest in the Hawaii Property to Martl.  SAC ¶ 54; Pls.' Ex. 60. The SAC alleges that "Martl did not pay Milgroom any consideration for his interest in the Hawaii Property or, in the alternative, Milgroom did not receive reasonably equivalent value in exchange for the transfer."  SAC ¶ 54.  Indeed, the deed recites that Martl paid Milgroom "consideration in the sum of TEN DOLLARS," and there was no conveyance tax for the transfer.  Pls.' Ex. 60.

The SAC asserts that Milgroom became insolvent as a result of his transfer of the Hawaii Property to Martl.  SAC ¶ 55.  Plaintiffs' expert opines that Milgroom had a negative net worth of approximately $2 million following the acquisition of the Hawaii Property by Defendants, and by the end of 2003, Milgroom had a negative net worth of $3 million.  Pls.' Ex. 28 at Ex. A.

####    d.     *Milgroom and Martl divorce*

On June 14, 2005, Martl filed for divorce against Milgroom.  SAC

¶ 58.  Martl's filing for divorce came only a month after the D'Ambrosio court

ordered Milgroom to file a $900,000 corporate surety, *see* Pls.' Ex. 22 at 10 ¶ 47,

and only two weeks after Milgroom failed to appear in the Massachusetts Action at

a Litigation Control Conference in which he was warned that "[f]ailure to appear

may result in the automatic default of dismissal of the action."  *See* Pls.' Ex. 11

(docket entry 104).  Milgroom completed the documents for the divorce and both

Milgroom and Martl certified under penalty of perjury that the information was

true and correct.  SAC ¶ 59; Pls.' Ex. 63.  Defendants nonetheless included "a

multitude of knowingly false and misleading information" to expedite the divorce

process, which was granted only two weeks later on June 28, 2005.  SAC ¶ 60.  In

the divorce papers, Defendants failed to identify income and expenses, failed to

identify bank accounts, and failed provide values for their assets.  *Id.*; Pls.' Ex. 63.

Milgroom also executed a Release of Marital Interest in the Hawaii Property,

which states that "for consideration paid, [he] hereby releases all of his marital

interests in this said property," even though he did not receive any consideration.

SAC ¶ 61; Pls.' Ex. 63.  The SAC asserts that Defendants included this release

with intent to hinder, delay or defraud Plaintiffs and other creditors of Milgroom

11

and that Milgroom became insolvent as a result of this release.  SAC ¶¶ 61-62.

After the divorce, Milgroom continued residing in the Hawaii Property and treating it as his own.  SAC ¶ 65; *see* Pls.' Exs. 66 (listing Defendants as co-insureds for the Hawaii Property), 67 (signing documents as if both Defendants owned and were selling the Hawaii Property).  Martl also provided Milgroom thousands of dollars to maintain the Hawaii Property and to pay his legal expenses.  *See* Pls.' Exs. 70, 91 at 194-96.  As of 2006, Martl was still providing funds to Milgroom.  *See* Pls.' Ex. 22 at 28 ¶ 130 ("Both [Milgroom and Maertl] testified that neither of them had any money of his own, but that [Martl] was providing for all of their needs, including more than $200,000 in legal fees for Defendant.").

> e.    *Milgroom declares bankruptcy*

On July 11, 2005, only two weeks after the divorce decree, Milgroom filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Hawaii.  SAC ¶ 67.  The bankruptcy court later found that Milgroom converted his bankruptcy case to Chapter 13 in August 2005, in part to avoid investigation and action by the Chapter 7 trustee after she identified his fraudulent transfers of property and warned him not to transfer any more property during the pendency of the proceedings.  SAC ¶ 71; Pls.' Ex. 96 at 4 ¶ 7.  Like the divorce

12

proceedings, Milgroom provided false and misleading information about his financial affairs in the bankruptcy proceeding.  Milgroom failed to disclose some of his accounts, the transfers of funds he received from Martl, or Plaintiffs as creditors.  SAC ¶¶ 74-76; Pls.' Exs. 16, 17.

Plaintiffs later began to participate in the bankruptcy action as creditors and attempted to gather discovery from Milgroom.  SAC ¶ 77.  The bankruptcy court ordered Milgroom to execute bank authorizations and produce his laptop computer, *see id.* ¶ 80; Pls.' Ex. 18, and in response, Milgroom refused to comply with discovery and ultimately absconded to Florida.  SAC ¶ 82; Pls.' Ex. 96 at 11 ¶¶ 28-29.

On May 12, 2006, the bankruptcy court entered an order (1) finding Milgroom in contempt of court, (2) awarding sanctions, (3) granting Plaintiffs relief from the automatic stay nunc pro tunc, and (4) denying Plaintiffs' request for a bench warrant.  SAC ¶ 83; Pls.' Ex. 96.  The bankruptcy court noted that Plaintiffs had "submitted substantial evidence concerning questionable transfers of [Milgroom's] interest in real property in Florida and in Hawaii to Martl during a four-year period prior to [Milgroom's] bankruptcy petition, including without limitation, the transfer of the [Milgroom's] interest in the [Hawaii Property] in 2003 for no consideration."  SAC ¶ 84; Pls.' Ex. 96 at 8 ¶ 23.  The bankruptcy

court further found that "[t]he Valvanis family has produced compelling evidence that [Milgroom] has engaged in fraudulent real estate and financial transactions with his wife, and then, ex-wife, Martl, between 2002 and the present.  It also appears that there is an on-going relationship between [Milgroom] and Martl." SAC ¶ 86; Pls.' Ex. 96 at 12 ¶ 33.  The bankruptcy court concluded that Milgroom "has failed to account for millions of dollars in real estate and financial transactions with his wife and then ex-wife, Nada Martl, and the real estate transaction concerning the [Hawaii Property], or to offer any credible explanation regarding such transactions."  SAC ¶ 87; Pls.' Ex. 93 at 13 ¶ 3.  As a result, the bankruptcy court dismissed the case with prejudice.  Pls.' Ex. 21.

> ### f.   Martl and Milgroom attempt to sell the Hawaii Property

In 2006, Martl listed the Hawaii Property for sale with an asking price of $6.5 million, which is less than the $8 million they had previously sought, the 2005 tax assessed value of $7,442,800, and the price for comparable homes in the area listing for $8,000,000.  SAC ¶¶ 89-90.  Martl was unable to sell the Hawaii Property, however, due to Plaintiffs' lis pendens on the Hawaii Property.  Pls.' Exs. 85, 86.  Around this time, Milgroom had the only set of keys to the Hawaii Property.  Pls.' Ex. 81 at 32.

**B.     Procedural History**

Plaintiffs filed their Complaint against Martl on March 10, 2006, and filed their FAC to include Milgroom as a Defendant on May 23, 2006.  On December 14, 2007, Plaintiffs filed a Motion for Leave to File Second Amended Complaint, and a Request for Entry of Default against Martl, based on her failure to answer or otherwise plead to the FAC.  The Clerk of Court entered default against Martl that same day.

On January 30, 2008, Plaintiffs filed their SAC against Milgroom asserting the following claims against him:[7] (1) violation of federal civil RICO Act (Count I); (2) conspiracy to violate federal civil RICO Act (Count II); (3) violation of Hawaii state civil RICO Act (Count III); (4) fraudulent transfer of Florida property to Maertl (Count V);[8] and (5) constructive and/or resulting trust and/or equitable lien (Count VIII).  The SAC also re-alleges the claims from the FAC, including: (1) violation of HUFTA (Count IV); (2) common law fraudulent transfer (Count VII); (3) civil conspiracy to defraud (Count VI); (4) injunction against

---

[7]  The SAC also named Christian Maertl, Martl's son, as a Defendant.  On April 10, 2008, the court granted Maertl's Motion to Dismiss for lack of personal jurisdiction.

The SAC did not name Martl, however, because default was entered against Martl on December 14, 2007 after she failed to answer the First Amended Complaint.  The procedural history regarding Martl's default is outlined in the Order Granting Plaintiffs' Second Motion for Default Judgment against Martl.

[8]  Plaintiffs have dismissed their claims for RICO violations and fraudulent transfer of Florida property to Maertl.

further disposition of the Hawaii and Florida properties (Count IX); and (5)

appointment of receiver (Count X).

On December 30, 2008, the court entered default against Milgroom as

a result of his willful conduct of violating numerous court orders and rules in an

attempt to prevent this action from proceeding on the merits ("Order Entering

Default"). *See Valvanis v. Milgroom*, 2008 WL 5412420 (D. Haw. Dec. 30, 2008).

The Order Entering Default outlined Milgroom's numerous violations of court

orders and rules by refusing to produce discovery despite orders compelling his

compliance, ignoring all pretrial deadlines, and filing numerous frivolous motions

to transfer this action to Florida. *Id.* at *7-9. Given the extent and number of

violations, the court concluded that Milgroom purposely engaged in this pattern of

conduct as part of an intentional scheme to prevent this action from proceeding to a

trial on the merits. The court therefore found that Milgroom's conduct was

sanctionable, and, after weighing the relevant factors, determined that entry of

default was the appropriate sanction. *Id.* at *10-12.

On February 2, 2009, Plaintiffs filed their Motion for Entry of Default

Judgment against Milgroom and a Supplemental Memorandum on February 11,

2009.  On April 3, 2009, Milgroom filed his Opposition,[9] and Plaintiffs filed their

Reply on April 17, 2009.  On April 27, 2009, the court held a hearing.  On May 7,

2009, Plaintiffs submitted a supplemental memorandum addressing judgment.

### III.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 55(b)(2), a plaintiff may

apply to the court for a default judgment against a defendant who has appeared in

the action.  *See also Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141 (9th Cir.

1989) (stating that Rule 55(b)(2) "applies to entry of default judgment when the

party suffering the default has appeared in the action").

A "court's decision whether to enter a default judgment is a

discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980);

*Draper v. Coombs*, 792 F.2d 915, 924 (9th Cir. 1986).  The court's starting point,

however, is that "default judgments are ordinarily disfavored" and that "[c]ases

should be decided upon their merits whenever reasonably possible."  *Eitel v.*

*McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).  In exercising its discretion, the

---

[9] In support of his Opposition to Plaintiffs' Motion for Entry of Default Judgment against him, Milgroom submitted Christian Maertl's Declaration in Support of Defendants' Opposition to Plaintiffs' Motion for Default Judgment.  This Declaration is improper for several reasons -- it presents largely only argument as opposed to facts, and the facts Maertl does present are either based on no personal knowledge (*e.g.*, the Massachusetts Action), or are irrelevant (*e.g.*, Maertl's conversations with Mr. Gierlach, Martl's attorney, regarding his representation of Martl).  Accordingly, the court STRIKES the Maertl Declaration.

court should consider the following factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id*. at 1471-72.

"With respect to the determination of liability and the default judgment itself, the general rule is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *see DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) ("In reviewing a default judgment, this court takes the well-pleaded factual allegations in the complaint as true." (citations and quotations signals omitted)); *see also* Fed. R. Civ. P. 8(b)(6).  The entry of default conclusively establishes the facts as to liability, but not damages.  *See Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).  While the court may conduct a hearing to determine damages, *see* Fed. R. Civ. P. 55(b)(2), the court can rely on evidence submitted by Plaintiffs or conduct a hearing if necessary.  Fed. R. Civ. P. 55(b)(2); *see Fustok v. Conti Commodity Servs.*, 873 F.2d 38, 40 (2d Cir. 1989).

# IV.  **DISCUSSION**

Plaintiffs argue that the *Eitel* factors weigh in favor of entry of default judgment against Milgroom as to their claims for HUFTA violations and conspiracy to defraud Plaintiffs.[10]  Based on the following, the court agrees that Plaintiffs are entitled to entry of default judgment as to these claims and should be awarded damages.

## A.    Consideration of the *Eitel* Factors

### *1.    Sufficiency of the SAC and Merits of Claims*

Generally, in determining the sufficiency and merits of a plaintiff's claims, the court takes the well-pled allegations of a complaint as true and performs a single inquiry regarding the merits of the plaintiff's substantive claims and the sufficiency of the complaint.  *See Fair Housing of Marin*, 285 F.3d at 906; *DIRECTV, Inc.*, 503 F.3d at 854; *see also* Fed. R. Civ. P. 8(b)(6).  Milgroom's default, however, does not present the typical default of a defendant who has failed

─────────────────────

[10]  Plaintiffs originally sought default judgment on their claims against Milgroom for HUFTA violations, conspiracy to defraud, common law fraudulent transfer, constructive and/or resulting trust and/or equitable lien, injunction against further disposition of the Hawaii property, and appointment of receiver.  During a February 18, 2009 status conference, Plaintiffs' counsel confirmed that the common law fraudulent transfer claim was redundant of the HUFTA claim, and Plaintiffs' other equitable claims assert requests for relief available under HUFTA and are therefore derivative.  *See* HRS § 651C-7; *see also Kekona v. Abastillas*, 113 Haw. 174, 182, 150 P.3d 823, 831 (2006) (noting that the appeals court stated that the common law preferential transfer rule was superceded by HUFTA).  Accordingly, the court addresses only Plaintiffs' HUFTA and conspiracy claims against Milgroom.

to answer the complaint and failed to participate in this action.  Rather, Milgroom

has actively participated in this action and the court entered default against him as

a sanction for his willful conduct in attempting to prevent this case from

proceeding on the merits.  The court therefore analyzes both the sufficiency of the

SAC and whether the evidence indicates a likelihood of success on the merits.  *See*

*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)

(stating that the district court "exceeded the requirements of [Rule 55] by taking

extensive evidence on *all* allegations in the complaint including damages").

### a.    HUFTA Violation

Plaintiffs proceed under two theories of HUFTA: (1) that Milgroom

transferred his assets to Martl with intent to defraud his creditors; and (2) that

Milgroom transferred assets to Martl without receiving reasonably equivalent value

and placing him in a position where he became insolvent and/or could not pay

debts as they became due.  As described below, the SAC sufficiently alleges a

claim under either of these theories and the evidence presented shows a strong

likelihood of success on the merits.

### i.    Intent to defraud

To state a claim under the first HUFTA theory, Plaintiffs must plead

that they are creditors of Milgroom, that Milgroom transferred the Hawaii Property

before or after Plaintiffs' claim arose, and that Milgroom "acted with actual intent to hinder, delay, or defraud" his creditors.  *See* HRS § 651C-4(a)(1).[11]

In support of their creditor status, the SAC alleges that Plaintiffs filed the Massachusetts Action in 1987.  SAC ¶ 11.  The Massachusetts Action continued for many years and no judgment was entered until October 18, 2005, after all of the property and asset transfers from Milgroom to Martl.  *Id.* ¶ 73.  The SAC further alleges that Plaintiffs have "a judgment [against Milgroom] in the amount of approximately $4 million."  *Id.* ¶ 114.  The evidence substantiates these allegations.  No judgment in the Massachusetts Action was entered until October 2005 when Milgroom was found in default, and on July 3, 2007, the court issued a Memorandum of Decision on Damages Trial and Order for Judgment, ordering judgment and damages in favor of Plaintiffs totaling almost $4 million.  Pls.' Exs. 11, 13.  Given that the definition of "creditor" includes individuals whose right to payment is not yet reduced to judgment, Plaintiffs are afforded creditor status under HUFTA.  *See* HRS § 651C-1 (defining a "claim" of a creditor as "a right to

---

[11] HRS § 651C-4 provides that:
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.").

In describing the "conveyance," the SAC alleges that: (1) Milgroom and Martl purchased the Hawaii Property on August 2, 2002 with $5.2 million cash, SAC ¶¶ 44, 50; (2) the $5.2 million cash is traceable to Milgroom's $10 million net worth, *id.* ¶ 50; (3) Milgroom transferred the Hawaii Property to Martl on May 13, 2003, *id.* ¶ 54; and (4) during their divorce, Milgroom signed a release of marital interest in the Hawaii Property. *Id.* ¶ 61.  The evidence supports these allegations -- Milgroom and Martl purchased the Hawaii Property with funds originating in whole or in substantial part from Milgroom's self-estimated $10 million net worth.  Prior to the Hawaii Property purchase, Milgroom transferred $9 million to Martl, who placed those funds in a German bank account.  *See* Pls.' Exs. 26, 29, 32, 33.  To purchase the Hawaii Property, on July 12, 2002, $6,499,982 was wire transferred from Martl's German bank account to First Hawaiian Bank and deposited into Defendants' joint checking account.  Pls.' Exs. 28 ¶ 23, 57, 58.  Milgroom then drew a check from this account for $7,125,000 payable to Milgroom, and deposited it into Defendants' joint savings account.  Pls.' Exs. 28 ¶ 24, 58.  Milgroom used these funds to purchase the Hawaii Property.  Pls.' Exs.

28 ¶ 25, 58, 59.  On May 13, 2003, Milgroom transferred his interest in the Hawaii

Property to Martl, and during their divorce, signed a release of marital interest in

the Hawaii Property.  Pls.' Exs. 60, 63.

   Finally, the SAC alleges that Milgroom transferred the Hawaii

Property to Martl with actual intent to hinder, delay or defraud Plaintiffs with

respect to their claims raised in the Massachusetts Action.  SAC ¶¶ 46.  In proving

this element, "a court may make a finding of fraudulent intent . . . on the basis of

circumstantial evidence; direct proof . . . will rarely be available."  *In re Agric.*

*Research & Tech. Group, Inc.*, 916 F.2d 528, 534 (9th Cir. 1990) (citation and

quotation signals omitted).  HUFTA provides that in determining the "intent"

element of HRS § 651C-4(a)(1), the following non-exclusive factors may be

considered:

   (1) The transfer or obligation was to an insider;
   (2) The debtor had retained possession or control of the
   property transferred after the transfer;
   (3) The transfer or obligation was disclosed or concealed;
   (4) Before the transfer was made or obligation was incurred, the
   debtor was sued or threatened with suit;
   (5) The transfer was of substantially all the debtor's assets;
   (6) The debtor had absconded;
   (7) The debtor had removed or concealed assets;
   (8) The value of the consideration received by the debtor was
   reasonably equivalent to the value of the asset transferred or the
   amount of the obligation incurred;
   (9) The debtor was insolvent or became insolvent shortly after
   the transfer was made or the obligation was incurred;

(10) The transfer had occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

HRS § 651C-4(b).

Many of these factors support a finding that Milgroom intended to defraud "any" of his creditors.  Milgroom transferred the Hawaii Property to an insider, his wife Martl.  Milgroom, who had an estimated net worth of $10 million, married Martl and then proceeded to systematically transfer millions of dollars to her, who then funneled those monies to foreign bank accounts.

Further, several of Milgroom's transfers of money and assets follow fast on the heels of major events in the D'Ambrosio[12] and Massachusetts Actions.  On March 1, 2002 -- the same day that he was served the D'Ambrosio Complaint -- Milgroom transferred $1.05 million of his funds and $950,000 of their joint funds to Martl's Bank of America checking account and then Martl transferred the resulting $2 million to her German bank account.  *See* Pls.' Ex. 32.  Over the next two months, Milgroom transferred an additional $7 million to Martl, who each time funneled these monies to her German bank account.  Pls.' Exs. 29, 33.  On

---

[12] Milgroom's "intent" as contemplated by HRS § 651C-4(a)(1) can be based on his acts towards either the D'Ambrosio Family or Plaintiffs because § 651C-4(a)(1) refers to transfers made with intent to defraud "any creditor," as opposed to a specific creditor.

July 16, 2002, the court in the D'Ambrosio Action denied Milgroom's motion to dismiss, and two weeks later, Defendants purchased the Hawaii Property with Milgroom's monies that were previously transferred to Martl. *See supra*.  With full knowledge of the D'Ambrosio Action, Milgroom later transferred not only his interest in the Hawaii Property to Martl, but also an additional $6.3 million in Treasury Direct investments held jointly by Defendants.  *See* Pls.' Ex. 28 ¶¶ 13-21. Finally, only one month after the D'Ambrosio court ordered Milgroom to file a $900,000 corporate surety, *see* Pls.' Ex. 22 at 10 ¶ 47, and only two weeks after Milgroom failed to appear at a Litigation Control Conference in which he was warned that "[f]ailure to appear may result in the automatic default of dismissal of the action," *see* Pls.' Ex. 11 (docket entry 104), Milgroom and Martl filed for divorce.  *See* Pls.' Ex. 63.

As a result of all of these asset transfers to Martl, Milgroom became insolvent -- Milgroom declared bankruptcy two weeks after the divorce was granted.  *See* Pls.' Exs. 17, 91 at 112.  Despite this divorce and his transfer of the Hawaii Property to Martl, Milgroom continued residing in the Hawaii Property and treating it as his own, *see* Pls.' Exs. 66 (listing Defendants as co-insureds for the Hawaii Property), 67 (signing documents as if both Defendants owned and were selling the Hawaii Property), and Martl provided Milgroom thousands of dollars to

maintain the Hawaii Property.  *See* Pls.' Exs. 70, 91 at 194-96.

Further supporting that Milgroom intended to defraud his creditors is that Milgroom has repeatedly made false statements regarding his wealth and transfers.  For example, in the divorce papers that Milgroom filed, Defendants failed to identify income and expenses, failed to identify bank accounts, and failed provide values for their assets.  Pls.' Ex. 63.  In the bankruptcy proceeding, Milgroom again provided false and misleading information about his financial affairs by failing to disclose some of his accounts, the transfers of funds he received from Martl, and the extent of his creditors.  Pls.' Exs. 16, 17.  When Plaintiffs became involved in the bankruptcy action and started pressing Milgroom for discovery, Milgroom refused to comply and left Hawaii, resulting in the bankruptcy court finding him in contempt.  Pls.' Ex 96.

In sum, the evidence presented shows that Plaintiffs will likely be successful in proving that Milgroom transferred his money and the Hawaii Property to Martl with an intent to defraud "any" of his creditors.  Accordingly, the sufficiency of the SAC and the merits of this claim weigh in favor of default judgment on this claim.

### ii.     *Less than reasonably equivalent value*

Under the second HUFTA theory, Plaintiffs may proceed pursuant to

HRS § 651C-4(a)(2)(B) or HRS § 651C-5(a).  To state a claim under HRS § 651C-4(a)(2)(B), Plaintiffs, in addition to pleading that Milgroom transferred property, must plead that Milgroom (1) did not receive "a reasonably equivalent value in exchange for the transfer," and (2) "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[13]  Similar to HRS § 651C-4(a)(2)(B), HRS § 651C-5(a) requires that (1) Milgroom did not receive a reasonably equivalent value in exchange for the Hawaii Property transfer, (2) Milgroom was insolvent at the time of the Hawaii Property transfer, or became insolvent as a result of the transfer, and (3) Plaintiffs were present creditors of Milgroom at the time of the Hawaii Property transfer.[14]  The SAC and evidence support all of the

---

[13]  HRS § 651C-4(a)(2)(B) provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> . . .
>
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

[14]  HRS § 651C-5(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the

(continued...)

elements under either theory.

First, the SAC alleges that both the "[t]ransfer of title to the Hawaii

Property to Milgroom and Martl, as tenants by the entirety" and the transfer of the

Hawaii Property from Milgroom to Martl were transfers for less than the

reasonably equivalent value.  SAC ¶¶ 47, 54.  The evidence presented supports that

the Hawaii Property was purchased with Milgroom's monies and that he did not

receive any consideration for these transfers.[15]  *See* Pls.' Exs. 28 ¶¶ 22-25, 26, 28,

29, 32, 33, 60, 63.

Regarding Milgroom's solvency and ability to pay debts, the SAC

alleges that as a result of these transfers, "Milgroom claimed he was or became

insolvent, and in fact, Milgroom was or became insolvent."  SAC ¶ 55.  Plaintiffs'

expert, who Milgroom does not challenge, opines that Milgroom had a negative net

worth of approximately $2 million following the acquisition of the Hawaii

Property by Defendants, and by the end of 2003, Milgroom had a negative net

---

[14](...continued)
> transfer or obligation and the debtor was insolvent at that time or the
> debtor becomes insolvent as a result of the transfer or obligation.

[15]  While Milgroom asserts that he transferred his assets to Martl in exchange for her
agreement to marry him and give up her real estate business, such acts do not have value and are
therefore not consideration.  Under HRS § 651C-3, "value is property or the securing or
satisfaction of debt."  *In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 534 (9th Cir.
1990).  In any event, Milgroom's assertion is not supported by any evidence and is contradicted
by the flow of money and assets to Martl.

worth of $3 million.  Pls.' Exs. 28 at Ex. A.  Indeed, after transferring millions of dollars and his interest in the Hawaii Property to Martl, Milgroom declared bankruptcy in 2005.  *See* Pls.' Exs. 16, 17, 96.

Finally, as described above, both the SAC and evidence support that Plaintiffs were present creditors of Milgroom at the time of the Hawaii Property transfer.  *See supra* § IV(A)(1)(a)(i).

In sum, the SAC adequately alleges, and the evidence presented shows a likelihood, that Plaintiffs will be successful in proving that Milgroom transferred his money and the Hawaii Property to Martl for less than reasonably equivalent value in violation of HRS §§ 651C-4(a)(2)(B) and 651C-5(a).  Accordingly, the sufficiency of the SAC and the merits of this claim weigh in favor of default judgment on this claim.

### b.   Conspiracy

While "the tort of conspiracy has not been clearly defined" in Hawaii caselaw, *Weinberg v. Mauch*, 78 Haw. 40, 49, 890 P.2d 277, 286 (1995) (citation and quotation signals omitted), at least one Hawaii court has recognized a claim for conspiracy to fraudulently transfer property.  *See Kekona v. Abastillas*, 113 Haw. 174, 180, 140 P.3d 823, 829 (2006) (stating that the appeals court did not err in affirming liability for conspiring to fraudulently transfer real property).

In general, the common law tort of civil conspiracy has three

elements: (1) the formation of a conspiracy; (2) wrongful conduct in furtherance of

the conspiracy, *i.e.*, an actionable claim based upon deceit; and (3) damage.

*Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996) (citing elements under

California law); *see also Weinberg*, 78 Haw. at 49, 890 P.2d at 286 ("[I]t is clear

that there can be no civil claim based upon a conspiracy alone.  [If a plaintiff does]

not set forth any actionable claim based upon deceit, there can be no claim against

any alleged joint tortfeasor based solely upon conspiracy to deceive.").

Here, the underlying actionable tort for the conspiracy claim is

Milgroom's fraudulent transfer of the Hawaii Property to Martl.  Because, as

described above, Plaintiffs have both alleged and submitted evidence showing a

likelihood on the merits for their HUFTA claim that Milgroom transferred assets to

Martl with intent to defraud his creditors, the wrongful conduct element is met.

Further, given that this scheme required the active participation of Martl -- by

receiving and transferring his funds to accounts in Germany, receiving his interest

in the Hawaii Property, and signing under penalty of perjury divorce papers that

failed to list all of their assets -- the evidence further establishes the likelihood of

proving that Milgroom and Martl formed a conspiracy to carry out these fraudulent

transfers.  *See also* SAC ¶ 157 (alleging that Defendants engaged in a scheme to

perform overt acts to defraud Plaintiffs).  Finally, Plaintiffs' damages are clear -- as

a result of Milgroom's transfers of property and assets to Martl, Milgroom claims

poverty and Plaintiffs have been unable to collect the Massachusetts judgment.

*See* Pls.' Exs. 10, 13.

Accordingly, the court concludes that allegations of the SAC and the

likelihood of success on the merits support finding default judgment against

Milgroom on the conspiracy claim.

### 2.    *The Possibility of Prejudice to Plaintiffs*

In entering default against Milgroom, the court considered the

possibility of prejudice to Plaintiffs and found that this factor weighed strongly in

favor of entry of default.  *Valvanis*, 2008 WL 5412420, at *11.  That reasoning

applies with equal force here.  The Order Entering Default explains:

> Plaintiffs have patiently sought resolution of this action
> for over two and half years and expended numerous
> resources addressing Milgroom's meritless arguments
> and roadblocks to discovery.  Milgroom's actions have
> prevented Plaintiffs from obtaining all of Milgroom's
> financial documents and from receiving an efficient trial
> on the merits.  If the court did not enter default, Plaintiffs
> would face the proposition of additional lengthy
> discovery regarding Milgroom's health and have no clear
> indication when or where trial may occur.

*Id.*  Milgroom has given the court every indication that he has no intention of

participating in a trial on the merits.  If the court does not enter default judgment

31

against him, Plaintiffs will suffer severe prejudice.

### 3.   *The Sum of Money at Stake in the Action*

A default judgment generally is disfavored if there is a large sum of money involved.  *See Eitel*, 782 F.2d at 1472 (denying motion for default in part due to amount sought, which totaled almost $3 million in damages).

In addition to equitable and/or provisional remedies, Plaintiffs seek judgment against Milgroom in the amount of the Massachusetts Judgment, which as of October 5, 2007 was $3,881,612.14.  While Plaintiffs have already proven this amount to the Massachusetts court, this significant amount weighs against entry of default judgment.

### 4.   *The Possibility of a Dispute Concerning Material Facts*

Based on the evidence and arguments currently before the court, there is little dispute as to the material facts.  Milgroom has never presented any evidence to rebut Plaintiffs' allegations and substantial evidence that:

(1) Plaintiffs' claims arose prior to the transfer of the Hawaii Property;

(2) Milgroom transferred almost all of his net worth to Martl, who placed the funds in foreign bank accounts; (3) the Hawaii Property was paid with funds that originated with Milgroom; (4) Milgroom transferred his interest in the Hawaii Property to Martl for no consideration; and (5) Milgroom became insolvent as a

result of the transfer of the Hawaii Property to Martl.  Rather than raise the possibility of dispute of these material facts, Milgroom presents a number of arguments, none of which is persuasive.

Milgroom argues that his transfers to Martl could not be fraudulent because at the time of these transfers, the Special Master's Report in the Massachusetts Action was in effect, which found that Plaintiffs owed Milgroom $150,000.  Milgroom explains that the Special Master's Report ended the Massachusetts Action because the parties had agreed that the Special Master would "make findings of fact and conclusions of law [that] shall be final and binding on the parties."  *See* Milgroom Ex. B.  Milgroom has previously made this argument in support of prior motions filed before this court, and the court has previously explained why this argument is meritless.  The court nonetheless explains once more.

In December 1991 in the Massachusetts Action, the parties agreed to refer their dispute to a special master, whose "findings of fact and conclusion of law shall be final and binding on the parties."  *See* Milgroom Ex. B.  In 1994, the "Special Master's Report" was issued.  *See* Doc. No. 74, Martl Ex. B-1 (attaching portions of Special Master's Report).  Under "Ultimate Primary Findings," the Special Master found that Plaintiffs owed Milgroom $150,000.  *Id.*  While the

33

Valvanis Family objected to the Special Master's Report in 1995, *see* Pls.' Ex. 11 (docket entry 99a), those objections were not timely heard by the court and the Special Master's Report was still in effect at the time Milgroom transferred his assets and the Hawaii Property to Martl.

The Special Master's Report does not impact Milgroom's "creditor" status under HUFTA at the time -- that is, it does not prevent a finding that Milgroom fraudulently transferred his assets to Martl because it was not a final and binding decision on the parties and did not end the Massachusetts Action.  In other words, Plaintiffs retained their claim (a disputed right to payment) against Milgroom at the time the Special Master's Report issued.  *See* HRS § 651C-1.

The Special Master's Report was not a final findings of fact and conclusion of law, but rather only *primary* findings.  Further, Massachusetts Rule of Civil Procedure 53, pursuant to which the Special Master was appointed, does not treat Special Master's Reports as final and instead allows for objections and requires the court to take action on them, either by "strik[ing] the report in whole or in part, modify[ing] it, recommit[ting] it to the master with instructions or tak[ing] any other action that justice requires."  Mass. R. Civ. P. 53(h)(2) & (4) (1994); *see also* Mass. R. Civ. P. 53(h)(1) (1994).  In the Massachusetts Action, Plaintiffs objected to the Special Master's Report and the Special Master's Report

34

did not become final.  *See* Pls.' Ex. 11 (docket entry 99a).  Finally, none of the

parties treated the Special Master's Report as a final decision ending the litigation -

- both Milgroom and Plaintiffs filed motions for extensions to file objections to the

Special Master's Report in January and March 1995, and Milgroom appeared pro

se after his attorney withdrew in 1995 and 1998.  *Id.* (docket entries 94, 95);  Pls.'

Ex. 15 ¶¶ 12, 18.  The Special Master's Report was therefore not a final decision

and neither took away Plaintiffs' creditor status nor precluded Milgroom's intent to

defraud his creditors.

Milgroom also provides his own version of events regarding why he

filed for bankruptcy, explaining that he declared bankruptcy because he had

received notice that in the D'Ambrosio Action, he was ordered to put up a

$900,000 bond and incorrectly believed that the D'Ambrosio family had received a

multi-million dollar judgment against him.  *See* Milgroom Opp'n at 5-6 ¶ 11.  Even

if true, such explanation does not rebut the evidence indicating that Milgroom

intended to defraud his creditors by transferring all of his assets to Martl.  Further,

regardless of why Milgroom filed for bankruptcy protection, once in that court he

provided false and misleading information about his financial affairs, refused to

participate in discovery, and was ultimately held in contempt of court.  *See* Pls.'

Ex. 96.  Accordingly, Milgroom's explanation does not raise the possibility of

dispute of material facts.

Because Milgroom has presented no possibility of a dispute concerning the material facts establishing Plaintiffs' claims against him, this factor weighs in favor of entering default judgment.

### 5.    *Whether the Default Was Due to Excusable Neglect*

Milgroom's default was not due to excusable neglect, but rather bad faith.  As explained in detail in the Order Entering Default Against Milgroom, Milgroom engaged in a pattern of conduct of committing numerous violations of court orders and rules as part of an intentional scheme to prevent this action from proceeding to a trial on the merits.  *See generally Valvanis*, 2008 WL 5412420. Milgroom refused to produce discovery, ignored all pretrial deadlines, brought repetitive frivolous motions to transfer this action to Florida, and knowingly violated numerous court orders.  *Id.* at *7-9.  Although Milgroom chalked up these violations due to his ignorance of court rules and a desire to be on "equal footing" with Plaintiffs, these excuses only supported the court's conclusion that he acted in bad faith to stall this action -- Milgroom is an indefinitely suspended attorney and no interpretation of any of the court rules or orders would suggest to a claimant that he can engage in such obstructionist behavior.  *Id.*  The court therefore found that Milgroom's conduct was sanctionable, and, after weighing the relevant factors,

determined that entry of default was the appropriate sanction. *Id.* at *10-12.

Milgroom attempts to explain that default was not due to excusable neglect but caused by a large-scale conspiracy between Milgroom's and Martl's attorneys, Plaintiffs, and the court to take away the Hawaii Property from Martl. Milgroom Opp'n at 5-13. Milgroom's assertions are both wholly false and ridiculous. For example, Milgroom states that his bankruptcy attorneys aided the bankruptcy court in finding Milgroom in contempt, *see id.* at 12 ¶¶ 29-30, when in fact Milgroom actively refused to comply with the bankruptcy court's orders and then left Hawaii, providing neither Plaintiffs nor his counsel his new address. *See Valvanis*, 2008 WL 5412420, at *5. Milgroom also asserts that Plaintiffs' attorneys were "duty bound" to notify the court in the Massachusetts Action that he had declared bankruptcy rather than allow default be entered against him, *see* Milgroom Opp'n at 11-12, but Plaintiffs did not learn about Milgroom's bankruptcy until *after* the Massachusetts court entered default against him.[16] *See* Pls.' Ex. 96 at 5 ¶ 12.

---

[16] Milgroom also argues that the court handicapped Milgroom and Martl in responding to Plaintiffs' Motions for Entry of Default Judgment because it refused to order Plaintiffs to give records they received in discovery from Mr. Gierlach, Martl's attorney, to Milgroom and Martl. Milgroom Opp'n at 16 ¶ A(1). Again, Milgroom twists the facts. Gierlach properly produced documents to Plaintiffs on behalf of Martl in response to discovery requests. Milgroom could just as easily served discovery on Gierlach requesting these documents, but did not. Plaintiffs had no obligation to turn those documents over to Milgroom.

Finally, Milgroom asserts that Plaintiffs never produced any evidence supporting their claims and instead made false accusations against him, and that Milgroom repeatedly explained Plaintiffs' falsehoods but that the court has simply accepted whatever Plaintiffs request.  Milgroom Opp'n at 26-27 ¶ 1.  Milgroom's revisionist history is not based on any fact.[17]  As shown from the facts recited above, Plaintiffs have presented *substantial* evidence supporting their claims.  The court afforded Milgroom multiple opportunities to explain his positions and present evidence, but Milgroom squandered each of these opportunities in an attempt to delay this action.  Instead, Milgroom provided lame excuses for his conduct, none of which could stand in light of the record.  *See Valvanis*, 2008 WL 5412420, at *8-9.  As explained in the Order Entering Default Against Milgroom, Milgroom has nobody to blame but himself for the entry of default.  This factor weighs strongly in favor of entry of default judgment.

### 6.   *The Strong Policy Favoring Decisions on the Merits*

This factor weighs against entry of default judgment.

### 7.   *Weighing the* **Eitel** *Factors*

Of the factors discussed above, only the amount at stake in the action

---

[17]  For example, Milgroom asserts that Plaintiffs have falsely accused Milgroom of being a disbarred attorney, but Plaintiffs submitted evidence of his disbarment and Milgroom has never come forward with evidence to the contrary.  *See* Pls.' Ex. 94, Order of Indefinite Suspension.

and the policy favoring decisions on the merits weighs against entry of default judgment.[18]  The other factors, however, all weigh strongly in favor of entry of default judgment.  Plaintiffs pled their claims against Milgroom with particularity and presented significant evidence showing that Milgroom transferred his assets to Martl to evade his creditors.  Rather than defend against these allegations, Milgroom has taken every opportunity to prevent this action from proceeding on the merits.  As a result, Plaintiffs will have no assurance that they will ever get an adjudication on the merits if default judgment is not entered against him.  Based on all the relevant factors, the court finds that default judgment against Milgroom is warranted.

**B.     Damages**

Plaintiffs ask that a monetary judgment be entered against Milgroom, and also seek punitive damages and equitable remedies, and in opposition, Milgroom provides no argument as to damages.

**1.     *Relief Under HUFTA***

On their HUFTA claim, Plaintiffs seek a monetary judgment and

---

[18]  Without regard to the *Eitel* factors, Milgroom also argues that the court should not enter default judgment at this time because the judgment against him in the Massachusetts Action is on appeal and the court should avoid the possibility of incongruous judgments.  *See* Milgroom Opp'n at 28 ¶ 6.  The Massachusetts Appeal does not affect the default judgment analysis -- it is not a relevant factor for the default judgment analysis.

various equitable remedies.  HUFTA lists a wide range of remedies available to

creditors such as Plaintiffs.  HRS § 651C-7 provides:

> (a) In any action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations provided in section 651C-8, may obtain:
>> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by chapter 651;
>> (3) Subject to applicable principles of equity and in accordance with applicable civil rules of procedure:
>>> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>>> (B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
>>> (C) Any other relief the circumstances may require.
> (b) If a creditor has obtained a judgment on a claim against the debtor, the creditor may, if the court so orders, levy execution on the asset transferred or its proceeds.

Regarding a monetary judgment, HRS § 651C-8 (b) provides:

> (b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 651C-7(a)(1), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less.  The judgment may be entered against:

(1) The first transferee of the asset or the person
for whose benefit the transfer was made . . . .

Regarding Plaintiffs' request for a monetary judgment against

Milgroom, the court finds that it cannot enter a judgment against both Milgroom

and Martl.  HRS § 651C-8(b)(1) provides that the court may enter judgment

against "first transferee of the asset or the person for whose benefit the transfer was

made."  Although Martl, as the first transferee, and Milgroom, the person for

whose benefit the transfer was made, both qualify under this language, § 651C-

8(b)(1), by using "or," contemplates that judgment be entered against *either* of

these individuals, not both.  Because, as explained in its Order Granting Plaintiffs'

Second Motion for Default Judgment against Martl, the court is not voiding the

transfer of the Hawaii Property from Milgroom to Martl, a monetary judgment

should be entered against Martl and not Milgroom.  The court further recognizes

that entering a monetary judgment against Milgroom would be redundant --

Plaintiffs already have a judgment against Milgroom in the Massachusetts Action

and have filed an exemplified copy of the Judgment in the Hawaii Circuit Court of

the First Circuit.  *See* Pls.' Ex. 10.

The court finds, however, that Plaintiffs are entitled to an assortment

of equitable remedies against Milgroom.  While the Hawaii Property will stay (for

the time being) in Martl's name, Milgroom has recently asserted that he may have

41

an interest in it.  Accordingly, to prevent Milgroom from either claiming an interest in the Hawaii Property or otherwise interfering with Plaintiffs' rights to the Hawaii Property, the court imposes a constructive trust and/or resulting trust over all assets in the Hawaii Property for which Milgroom has any interest, whereby Milgroom is the constructive and/or resulting trustee of these assets for the benefit of Plaintiffs. The court further permanently restrains and enjoins Milgroom or anyone acting by, though, or on his behalf from attempting to sell or transfer any interest in the Hawaii Property, or interfering in any way with the sale of the Hawaii Property or liquidation of the court's judgment entered against Martl.  Finally, the court also expands the duties and responsibilities of the court-appointed Receiver, Michael D. Hong or his successor, such that he may undertake appropriate actions consistent with judgment in this action.[19]

### 2. *Conspiracy Damages*

Plaintiffs seek an entry of damages in the amount of the judgment in

---

[19] Plaintiffs also ask that the court retain jurisdiction over this action such that Plaintiffs may seek leave of the court to amend or modify the judgments entered in this action in the event that assets, other than the Hawaii Property are located within the jurisdiction of this court. Plaintiffs' HUFTA claim against Martl, however, was limited to the Hawaii Property and Martl is a necessary party to Plaintiffs' HUFTA claim.  *See Tanaka v. Nagata*, 76 Haw. 32, 36, 868 P.2d 450, 454 (1994) ("[A] transferee who retains title to the subject property or who claims an interest in the property or its proceeds . . . is a necessary party to any action seeking to set aside the transfer.  Such an action for relief against a transfer alleged to be fraudulent should be brought pursuant to [HUFTA] . . . .").  Plaintiffs are not entitled to this relief because they have not alleged claims against Martl based on assets beyond the Hawaii Property.

the Massachusetts Action, as well as punitive and exemplary damages against

Milgroom in the amount of $1,000,000.[20]  As described above, Plaintiffs already

have a judgment against Milgroom in the Massachusetts Action such that entering

judgment against Milgroom in the amount in that amount would be redundant.

Accordingly, the court addresses punitive damages.

Punitive damages are "'damages assessed in addition to compensatory

damages for the purpose of punishing the defendant for aggravated or outrageous

misconduct and to deter the defendant and others from similar conduct in the

future.'"  *Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of*

*Directors v. Venture 15, Inc.*, 115 Haw. 232, 297, 167 P.3d 225, 290 (2007)

(quoting *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 570 (1989).  In

order to recover punitive damages,

> the plaintiff must prove by clear and convincing evidence
> that the defendant has acted wantonly or oppressively or
> with such malice as implies a spirit of mischief or
> criminal indifference to civil obligations, or where there
> has been some wilful misconduct or that entire want of
> care which would raise the presumption of a conscious
> indifference to consequences.
>     In determining whether an award of punitive
> damages is appropriate, the inquiry focuses primarily
> upon the defendant's mental state, and to a lesser degree,

---

[20]  Plaintiffs did not seek punitive damages on their HUFTA claim and the court therefore need not determine whether such damages are available under HUFTA.

the nature of his conduct.

. . . [T]o justify an award of punitive damages, a positive
element of conscious wrongdoing is always required.
Thus, punitive damages are not awarded for mere
inadvertence, mistake, or errors of judgment.  Something
more than the mere commission of a tort is always
required for punitive damages.

*Id.* (citation and quotations signals omitted).

Hawaii Civil Jury Instruction 8.12 echos these principles, and further

explains the measure of punitive damages:

The proper measure of punitive damages is (1) the degree
of intentional, willful, wanton, oppressive, malicious or
grossly negligent conduct that formed the basis for your
prior award of damages against that defendant and (2) the
amount of money required to punish that defendant
considering his/her/its financial condition.  In
determining the degree of a particular defendant's
conduct, you must analyze that defendant's state of mind
at the time he/she/it committed the conduct which formed
the basis for your prior award of damages against that
defendant.  Any punitive damages you award must be
reasonable.

Haw. Civil Jury Instruction No. 8.12.

The evidence presented demonstrates, by clear and convincing

evidence, that Milgroom engaged in a willful, elaborate scheme to hide his assets

and frustrate his creditors' attempts to collect on his debts.  Once served with the

complaint in the D'Ambrosio Action, Milgroom transferred his wealth to Martl

until he had no assets of his own and Martl securely held all of his money in

44

foreign bank accounts.  *See* Pls.' Ex. 28, 29, 32, 33.  Given this timing and the very

questionable circumstances of Milgroom's transfers of his wealth to Martl, the

court is led to the undeniable conclusion that Milgroom knew that he had creditors

and transferred his assets to Martl with the specific intent to prevent them from

collecting on his debts.

Even after Martl held all of Milgroom's money in foreign bank

accounts, Milgroom continued his scheme to further separate himself from his

assets now held by Martl.  Only one month after the D'Ambrosio court ordered

Milgroom to file a $900,000 corporate surety, *see* Pls.' Ex. 22 ¶ 47, and only two

weeks after Milgroom failed to appear in the Massachusetts Action at a Litigation

Control Conference in which he was warned that "[f]ailure to appear may result in

the automatic default of dismissal of the action," *see* Pls.' Ex. 11 (docket entry

104), Milgroom and Martl filed for divorce.  In the divorce papers that Milgroom

prepared, filed, and signed under penalty of perjury, Milgroom failed to identify

income and expenses, failed to identify bank accounts, and failed to provide values

for their assets.  Pls.' Ex. 63.  Indeed, other than the Hawaii Property (assigned to

Martl) and an automobile, the divorce papers did not disclose *any* of the assets that

Milgroom transferred to Martl.  *Id.*  Despite this divorce on paper, Martl provided

Milgroom tens of thousands of dollars after the divorce was final.  *See* Pls.' Exs.

45

70, 91 at 194-96.

With no assets of his own on paper and just two weeks after his divorce from Martl was granted, Milgroom filed a Chapter 7 bankruptcy petition. Milgroom again provided false and misleading information about his financial affairs by failing to disclose some of his accounts, the transfers of funds he received from Martl, and the extent of his creditors.  Pls.' Exs. 16, 17.  Milgroom later converted his bankruptcy case to Chapter 13 in August 2005 in part, as the bankruptcy court found, to avoid investigation and action by the Chapter 7 trustee after she identified his fraudulent transfers of property and warned him not to transfer any more property during the pendency of the proceedings.  Pls.' Ex. 96 at 4.  Once Plaintiffs began participating as creditors in the bankruptcy action, Milgroom refused to execute bank authorizations, produce his laptop computer, or otherwise participate in discovery, and ultimately absconded to Florida.  Pls.' Exs. 18, 96.  As a result, the bankruptcy court held him in contempt and dismissed the case with prejudice.  Pls.' Exs. 21, 96.

Milgroom's actions show that he was willing to take extreme steps to hide his assets and prevent his creditors from tracking down these transfers. Indeed, this court witnessed firsthand Milgroom's attempts to prevent Plaintiffs from learning the extent of his transfers to Martl by flouting court orders and rules.

46

In this action, Milgroom refused to produce any documents or certify his interrogatory responses, and then launched a series of frivolous arguments meant only to delay this action and prevent Plaintiffs from receiving a trial on the merits. *See generally Valvanis*, 2008 WL 5412420.  In sum, the evidence of Milgroom's conscious efforts to evade his creditors is compelling and clearly and convincingly show that Milgroom engaged in this scheme for the express purpose of preventing his creditors from gaining access to his assets.  Accordingly, awarding punitive damages is necessary to punish Milgroom for his outrageous conduct and to deter both Milgroom and others from similar conduct in the future.

Regarding the amount of punitive damages, the court recognizes that Milgroom's financial condition is questionable because he has transferred all of his wealth to Martl.  Plaintiffs have presented evidence, however, that Martl is still supporting Milgroom and Milgroom's conduct is reprehensible, both supporting a higher amount of punitive damages.  Taking these factors into consideration, the court finds that a punitive damages award against Milgroom in the amount of $250,000 is appropriate.

## V.  <u>CONCLUSION</u>

Based on the above, the court ENTERS DEFAULT JUDGMENT against Milgroom on Plaintiffs' claims for HUFTA violations and conspiracy to

defraud.  The court further ORDERS that:

1. a constructive trust and/or resulting trust shall be imposed over all assets in the Hawaii Property for which Milgroom has any interest, whereby Milgroom is deemed the constructive and/or resulting trustee of these assets for the benefit of Plaintiffs;

2. Milgroom or anyone acting by, through, or on his behalf is permanently restrained and enjoined from attempting to sell or transfer any interest in the Hawaii Property, or interfering in any way with the sale of the Hawaii Property or liquidation of the court's judgment entered against Martl;

3. the duties and responsibilities of the court-appointed Receiver, Michael D. Hong or his successor, are expanded consistent with default judgment being entered against Defendants, without further order of the court.  Such duties and responsibilities shall include, but are not limited to, assisting Plaintiffs with (a) inspection of the Hawaii Property, (b) liquidating the Judgment entered against Martl, and (c) execution against the Hawaii Property pursuant to HRS § 651 or other applicable law.  Among such other things, the Receiver is authorized and directed to repair and restore the Hawaii Property to the extent

48

necessary to adequately show and hold open houses of the Hawaii

Property for prospective purchasers and interested parties, and allow

the Receiver to advertise and otherwise market the Hawaii Property

for sale, and accept offers for purchase of the Hawaii Property, subject

to court approval; and

4.       Punitive damages against Milgroom in the amount of $250,000.

Because no claims remain against Milgroom or Martl, the court orders

the Clerk of Court to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 1, 2009.



_/s/ J. Michael Seabright_
J. Michael Seabright
United States District Judge

*Valvanis et al. v. Milgroom et al.*, Civ. No. 06-00144 JMS/KSC, Order Granting Plaintiffs' Motion for Entry of Default Judgment Against Defendant Robert B. Milgroom as to the Second Amended Complaint